## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                          CR. No. 17-370 JCH

IMAD AYSHEH, *also known as*
IMAD MANASSRA, IYAD AYSHEH,
NEDAL AYSHEH, RAED AYSHEH and
NAEL ALI,

        Defendants.


## MEMORANDUM OPINION AND ORDER

This case is before the Court on two motions filed by the Defendants. The first is a discovery motion, while the second is a motion in limine.

### I.    Motion to Compel

The first motion is *Defendants' Joint Motion to Compel Specific Discovery and Giglio/Impeachment Material* [Doc. 402], in which Defendants ask to the Court to order the Government to produce law enforcement training records and *Giglio* materials.

#### A.  Law Enforcement Training Records

First, Defendants argue that the Government should be compelled to produce "USFWS (United States Fish and Wildlife Service) training records for the 3 main agents in this case." Doc. 402 at 1. According to Defendants, the records are "relevant to the quality and credibility of the investigation and whether it was carried out in conformity with their training, as well as to challenge the agents' quality or lack of training," *id*. at 3, and that all of the foregoing is relevant to impeach the agents and the investigation. Defendants further explain that USFWS agents only

more recently (in 2010) obtained jurisdiction to enforce the Indian Arts and Crafts Act, so therefore they have different training and experience than their colleagues in the FBI and other law enforcement agencies.

In response, the government points out that Defendants have merely speculated that the training records may contain impeachment material and have offered no concrete no concrete facts supporting their belief that this is the case. It argues that in the absence of a demonstrated need for the evidence, it is not required to open its files to the Defendants to conduct what amounts to a fishing expedition.

The Court agrees with the government. In the absence of a more concrete basis for requesting the records, the Court will deny this portion of the motion to compel.

### B. *Giglio* Materials

Second, Defendants ask for production of all *Giglio* material in advance of trial.[1] In its response [Doc. 410] filed on February 2, 2024, the Government stated it would produce those materials by "early next week." *Id*. at 4. At the February 4, 2024, call of the calendar, counsel for the Government reiterated that its production of *Giglio* materials was imminent. Because a month has passed since the Government made those statements, the Court assumes that the Government has produced the *Giglio* materials and that the matter is now moot. If the Government has not yet done so, the Court orders the United States to produce its Giglio materials **no later than March 12, 2024**.

---

[1] At the time Defendants filed their motion, trial was set for February 20, 2024. It has now been reset for May 6, 2024.

II.     **Motion in Limine**

A.  **Statements Made by Third Parties at Jewelry Stores Owned by Others**

In their *Joint Motion in Limine to Exclude Evidence of Sales Made by People and Businesses Other Than the Defendants and Their Businesses* [Doc. 404], Defendants ask the Court to exclude evidence of statements and jewelry sales made by individuals at stores the Defendants do not own or operate. In particular, Defendants point to items on the Government's exhibit list that "relate[] to undercover purchases of IJ jewelry" from stores known as Momeni and Gold House in Santa Fe, New Mexico, and Soaring Eagle in Ketchikan, Alaska. Doc. 404 at 2. According to the Government, it will present bank documents showing that Iyad Aysheh, acting as a wholesaler, sold jewelry manufactured in the Philippines and marked "IJ" to those three retailers. U.S. Fish and Wildlife Service Agent Russ Stanford visited the stores undercover in 2015, where he observed pieces of jewelry marked "IJ" that were similar to jewelry he inspected in a shipment from Imad's Jewelry to I Jeweler's Wholesale, Inc. The Government proposes to offer audio or video recordings of Agent Stanford's interactions with the store employees, including statements by store owners or employees misrepresenting the origin of the jewelry by falsely stating it was made by Native American artists.

Defendants object on the grounds that the evidence is irrelevant, arguing it does not bear on the question of whether the Defendants conspired to import jewelry without the required country-of-origin markings or whether they intended to mislead consumers into believing the jewelry was Native American-made. They contend that statements made by these third-party retailers are not admissible against Defendants unless there is evidence either that a Defendant misled the retailer as to the origin of the jewelry or the retailer is a member of the alleged conspiracy. However, Defendants assert that there is no indication that the Government possesses

3

the evidence to tie them to these statements, arguing that the mere fact that these businesses purchased IJ jewelry is not enough. They also contend that even if the evidence had probative value, it would be outweighed by the danger of unfair prejudice under Rule 403 because it would "invite the jurors to speculate as to whether the retailers were misled about the origin of the jewelry or were coached on how to represent it." Doc. 404 at 6. Defendants also argue that it "would mislead the jury by suggesting that other people's actions are somehow attributable to the Defendants when there is no legal basis for that suggestion." *Id*. Finally, they contend that "because some of the owners of these businesses speak with accents similar to the Defendants, jurors might draw an impermissible inference that these similarities are evidence of a conspiracy between the Defendants and those owners." *Id*.

In response, the Government asserts that "evidence of how retailers sold the Ayshehs' jewelry is relevant as overt acts in furtherance of the conspiracy by unindicted coconspirators and as to the Ayshehs' knowledge of the essential objective of the conspiracy—to sell their jewelry falsely" under the guise of being Native American-made. Doc. 411 at 1. The Government argues that evidence of several separate retailers in different locations purchasing jewelry from the Defendants and then falsely representing it as Native American makes it more likely that Iyad Aysheh participated in a conspiracy knowing the objective was to sell foreign-made jewelry as Native American. It also contends that the evidence makes it less likely that Iyad informed the retailers that they could not claim the jewelry was Native American-made. The Government also contends that the three separate incidents make the similar misrepresentations (along with Raed Aysheh's alleged misrepresentation at his Golden Bear store in California) far less likely to be a coincidence. Indeed, coupled with evidence of Defendants' years of experience with the Native American jewelry market, the evidence supports the inference that the Defendants knew how their

imported jewelry would be sold by jewelers with whom they were familiar. The Government also points out (in agreement with the Defendants) that the importation of the jewelry without a country-of-origin marking facilitated retailers' ability to misrepresent the jewelry's provenance, which is relevant to Defendants' knowledge and intent. It is also relevant to show that the jewelry was distributed to retailers in the United States as part of the "manner and means" of the conspiracy as alleged in the Superseding Indictment.

The Court concludes that the evidence of statements made by third-party jewelers is admissible. Provided that the Government is able to lay a foundation showing that one of the Defendants sold "IJ" jewelry to each of the stores in question, the evidence is relevant to show that the Defendants distributed their jewelry in the United States, that they did so without a country of origin marking, that doing so made it easier for retailers to misrepresent the jewelry's origins, and that Defendants more likely had the requisite knowledge and intent for their jewelry to be sold in that manner—all of which go to the existence of a conspiracy and its ultimate objective. The Court agrees with the Government that while one of Defendants' retail customers describing the jewelry as Native American-made could be a coincidence, three separate statements by different individuals at different stores supports the inference that Defendants knew how the jewelry would be sold.

The Court is not persuaded by the cases cited by Defendants, who argue that the evidence is not admissible because the mere fact that these businesses purchased IJ jewelry does not show that Defendants conspired to violate the law or that the third-party retailers are co-conspirators. Each of those cases is distinguishable. First, *United States v. Williamson*, 53 F.3d 1500, 1518 (10th Cir. 1995), the question at issue was whether the statements of a third party were admissible as non-hearsay statements of a co-conspirator under Rule 801(d)(2)(E) of the Federal Rules of

Evidence. The *Williamson* court merely stated that evidence of a buyer/seller relationship alone is not enough to tie the buyer part to the seller's larger conspiracy. *Id*. However, to show that the individuals in the recordings are co-conspirators is not, as the Court understands it, the purpose for which the Government is offering this evidence. Rather, the evidence is being offered not for its truth, but rather: (1) for the fact that it was said, making it non-hearsay, and (2) for the inferences can be drawn about the Defendants and their intent from the fact that numerous customers said similar things about Defendants' jewelry. Therefore, *Williamson* is inapposite. *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990), in which the court stated that "proof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy," is similarly unhelpful. Again, the evidence is not being offered solely to prove that the retailers were part of the Defendants' alleged conspiracy. *United States v. Cruse*, 805 F.3d 795, 813 (7th Cir. 2015), which centers on the denial of a jury instruction about the distinction between a buyer-seller relationship and a conspiracy, is unhelpful for the same reasons.

Furthermore, the Court is not persuaded by Defendants' argument that the evidence should be excluded as more unfairly prejudicial than probative under Rule 403. It is not cumulative because it is evidence of consistent behavior by the Defendants' customers across different retailers, stores, and localities, which tends to support the existence and purpose of the conspiracy—i.e., that either the retailers were victims who did not know that they had purchased inauthentic jewelry from the Defendants, or that the retailers did know but, as unindicted coconspirators, chose to market the jewelry as authentic. Those inferences, while prejudicial to Defendants, are not *unfairly* prejudicial.  As for the jurors improperly lumping in the Defendants with the third-party retailers as members of a conspiracy because of their accents, the Court finds it very unlikely. The Government has stated that in its case-in-chief it will not introduce the voices

of any of the Defendants except Raed, who has little to no accent. The probity of the evidence outweighs any small risk of unfair prejudice. Therefore, the Court will deny the motion in limine as to this evidence.

### B.  Corporate Formation Documents

Finally, Defendants object to the introduction of Government exhibits 46 and 48, which are New Mexico Secretary of State documents related to the formation of the companies owning Gold House and Momeni. Because none of the Defendants nor any Government witness owned those companies, Defendants contend the evidence is irrelevant.

The Government asserts that the documents are relevant because they show ownership of the businesses and therefore connect financial transactions between I Jewelers and the owners of Momeni, and well as between I Jewelers and the owners of Gold House—two of the locations where Agent Stanford found the IJ jewelry and conducted the recorded investigation previously discussed in this opinion. The Court agrees the documents are relevant to show that I Jewelers sold the jewelry in question, and therefore this portion of the motion will be denied as well.

**IT IS THEREFORE ORDERED** that:

(1)  *Defendants' Joint Motion to Compel Specific Discovery and* Giglio/*Impeachment Material* [Doc. 402] is **DENEID IN PART** as to the training records but **GRANTED IN PART** as to the *Giglio* materials, which are due no later than **March 12, 2024**; and

(2) Defendants' *Joint Motion in Limine to Exclude Evidence of Sales Made by People and Businesses Other Than the Defendants and Their Businesses* [Doc. 404] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**

7